---

(148 App. Div. 177.)　　　　　　In re EGAN.

(Supreme Court, Appellate Division, First Department. December 29, 1911.)

RECORDS (§ 14*)—MUNICIPAL RECORDS—INSPECTION BY TAXPAYERS—STATUTORY RIGHT.

 Under General Municipal Law (Consol. Laws 1909, c. 24) § 51, making all books and papers filed in an office public records, open to the inspection of any taxpayer, and sections 50–55, and Code Civ. Proc. § 1925, authorizing taxpayers' actions to prevent waste of public funds, a taxpayer is entitled to inspect papers in the office of the board of water supply of the city of New York, including the reports of the chief and consulting engineers of the board relating to the award of a contract for public work, involving a large sum, where the contract was let on public competition to a contractor whose bid was substantially higher than the lowest and next lowest bid, and the taxpayer, to obtain mandamus to permit such inspection, need not allege fraud or improper conduct on the part of the board in letting the contract.

 [Ed. Note.—For other cases, see Records, Cent. Dig. §§ 13–18; Dec. Dig. § 14.*]

 Scott and Dowling, JJ., dissenting.

Appeal from Special Term, New York County.

Application of John J. Egan for a writ of mandamus directed to the Board of Water Supply of the City of New York, Charles Strauss and others, as Commissioners of and constituting the Board of Water Supply, to compel an inspection of the books and records of the of-

---

fice of the Board. From an order granting a motion for the writ, defendants appeal. Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Archibald R. Watson, Corp. Counsel (Terence Farley, of counsel), for appellants.

Parker, Hatch & Sheehan (Alton B. Parker, of counsel, and Theodor Mcgaarden, on the brief), for respondent.

CLARKE, J. Appeal from an order directing that a peremptory writ of mandamus issue to the board of water supply and the commissioners thereof directing them to permit and afford the petitioner, or his attorney, an opportunity to inspect any and all reports of the chief and consulting engineers to the said board, or of any of the said engineers, on or relating to the passing upon and awarding by the said board of the contract known as "contract 90," and to permit and afford the petitioner, or his attorney, an opportunity to make extracts from the aforesaid reports.

The petitioner is a taxpayer. He alleges: That the respondents advertised for bids for the construction of a tunnel extending under the Hudson river between Storm King and Break Neck Mountains, known as the "Hudson Siphon"; that four bids were received. That Anthony C. Douglas bid $1,432,000; that Winston & Co. & Breuchard bid $1,483,936; that the T. A. Gillespie Company bid $1,648,000; and McArthur Bros. Company bid $1,755,168. That the board awarded the contract to the T. A. Gillespie Company, whose bid was $165,064 higher than that of Winston & Co. & Breuchard, and $217,000 higher than that of Douglas. That Charles Strauss, the president of the said board, was for a time opposed to the granting, or at least reluctant to the granting, of the said contract to the T. A. Gillespie Company, under the circumstances, but finally joined with the other commissioners in awarding the contract. That the said Winston & Co. & Breuchard are reliable and experienced contractors now doing excellent work in connection with the work of said board on two contracts which were more than half completed ahead of the schedule time at the date when the said contract 90 was awarded. That Anthony C. Douglas is a man of high reputation and integrity who has done difficult tunneling and shaft work and has an excellent reputation in carrying out such works. That the source of petitioner's information and the grounds for his belief of such statements is the report of the commissioners dated June 20, 1911. That because of the awarding of the said contract to the T. A. Gillespie Company, notwithstanding the fact that its bid was so much higher than the two bids made by thoroughly reliable contractors who had offered to give the most ample security for the timely performance of said contract, and because the contract could have been awarded to said responsible bidders, thereby saving to the city of New York the amount of the difference in said bids, the petitioner is desirous of inspecting any and all reports of the chief and consulting engineers to the said board of water supply, or of any of the said engineers, relating to

the passing upon and awarding of the said contract which may be on file in the offices of the said board, and also of inspecting all other minutes, entries, books, and other papers connected with or relating to the passing upon and awarding of the said contract by the said board, for the purpose of ascertaining whether the awarding of the said contract, as aforesaid, was in the best interests of the taxpayers of the city of New York and of your petitioner as one of the said taxpayers. He alleges a request to be allowed such examination to the board and a refusal by it. Thereafter he applied for a peremptory writ of mandamus which was granted by the order appealed from.

It is provided in section 51 of the General Municipal Law (chapter 24, Cons. Laws 1909; chapter 29, Laws 1909) that:

"All books of minutes, entry or account, and the books, bills, vouchers, checks, contracts or other papers connected with or used or filed in the office of, or with any officer, board or commission acting for or on behalf of any county, town, village or municipal corporation in this state, are hereby declared to be public records and shall be open, subject to reasonable regulations to be prescribed by the officer having the custody thereof, to the inspection of any taxpayer."

This provision, as well as the similar provision in the charter (section 1545, Charter of the City of New York; chapter 466, Laws of 1901), have been considered by the courts of this state on several occasions. For many years, since at least 1872, taxpayers' actions have been authorized by the laws of this state. Chapter 161 of the Laws of 1872; chapter 531 of the Laws of 1881. This policy is now expressed in section 1925 of the Code of Civil Procedure and in article 4 of the General Municipal Law (chapter 24, Cons. Laws 1909; chap-29, Laws of 1909). The official corruption and mismanagement which were part of the history of the city of New York, known as the "Tweed Ring Frauds," were sought to be prevented in the future by providing for publicity of the records in public offices and representative actions by taxpayers. One was the necessary corollary of the other. To confer the right to sue without conferring the right of investigation, would have been idle. It has come to be the accepted view that publicity is a preventive, if not a cure, for many evils; and publicity statutes have been enacted for quasi public as well as public corporations, and is earnestly advocated by many for all corporations.

The early cases, therefore, before the authorization of taxpayers' actions, which denied the right of inspection unless the applicant showed a special and personal interest, are inapplicable, because the taxpayer, as a taxpayer, has such interest, established by law, as authorizes his action. Three cases are urged as authority for the reversal of this order. In Matter of Lord, 167 N. Y. 398, 60 N. E. 748, which was an appeal by the petitioner from an order which limited his examination of the personal tax assessment books in the office of the commissioner of taxes in the city of New York, the majority of the Court of Appeals said, in affirming the order:

"We are not called upon at this time to determine the limits of a taxpayer's right of inspection. In the case at bar the petitioner has been allowed to examine his individual assessment and the assessment of all those taxpayers he represents in any capacity, and the only claimed right denied him is a

general and unlimited inspection of the record. The necessity for examining the tax record will undoubtedly arise in many cases and in varying circumstances not to be anticipated, and each application must therefore be dealt with according to its peculiar facts. The courts will see to it that the rights of the taxpayer are properly protected."

Judge Cullen, with whom Judge Landon concurred, dissented upon the ground that the petitioner, as a taxpayer, was interested not only in the assessment for personal property levied on himself, but also in that imposed on others, for, the greater the assessment on others, the less would be the amount of taxes which he ultimately would be compelled to pay, and said: "The petitioner, therefore, is deprived of his statutory rights."

In People ex rel. Woodill v. Fosdick, 141 App. Div. 450, 126 N. Y. Supp. 252, this court refused inspection of the stenographer's minutes of an investigation being conducted by the commissioner of accounts under the directions of the mayor, and in Matter of Allen, 131 N. Y. Supp. 1027, decided at the November term, 1911, we refused an order for the examination of certain papers in the health department upon consideration of the peculiar character of that department and its records and the special provisions of section 1175 of the charter, which conferred discretion upon the board of health as to the publicity of its papers, files, reports, records, and proceedings.

The case at bar is in no way similar to either the Fosdick or the Allen Cases, supra. A great public contract, upon a work of the utmost importance to the city, involving a large sum of money, has been let upon public competition to a contractor whose bid was $217,000 higher than the lowest of his competitors, and $167,000 higher than the next lowest, and the commissioners in their report, after referring to the two lower bids, state:

"The board has come to the reluctant conclusion that the interest of the city will not be best served by the awarding of this contract to them."

If it be conceded that, under the act creating the water supply board, no obligation was placed upon the commissioners to accept the lowest bid, but that they were invested with discretion in the matter, and assuming that the exercise of that discretion is not reviewable by the courts, it still remains the fact that their action was so important, involved such an amount of money, and was so contrary to the ordinary rule of awarding public contracts to the lowest responsible bidder, that the board itself has felt compelled to explain and almost to apologize for its action. It would seem that it ought to be eager to make public the reports of its chief and consulting engineers, instead of opposing the motion. The refusal to permit inspection is in and of itself a circumstance of weight. While in the papers nothing is set forth to suggest fraud or improper conduct, such allegations are not necessary. They might be necessary in a taxpayer's action brought to question the act of the board, but this proceeding is simply directed to the right of inspection of a public paper.

That the reports of the chief and the consulting engineers made to the board and on file with it are not secret and confidential papers, but are official papers made by one public officer to his superior public

officer in the performance by both of them of public duties, is too obvious to require argument.

Even within the limitations of the three cases cited I am of the opinion that such facts and circumstances are shown in the matter at bar as justify the order appealed from. It should therefore be affirmed, with $10 costs and disbursements to the respondent.

INGRAHAM, P. J., and McLAUGHLIN, J., concur.

SCOTT, J. (dissenting). In my opinion the order appealed from should be reversed.

The only statute bearing upon the question, and the only one relied upon by the petitioner, is section 51 of the General Municipal Law, for section 1545 of the Greater New York Charter, which is also what is called a "publicity statute," refers only to heads of departments and chiefs of bureaus. Section 51 of the General Municipal Law provides that:

"All books of minutes, bids, vouchers, checks, contracts or other papers connected with or used or filed in the office of, or with any office, board or commission acting for or on behalf of any county, town, village or municipal corporation in this state are hereby declared to be public records, and all are open, subject to reasonable regulation to be prescribed by the officers having the custody thereof, to the inspection of any taxpayer."

The relator disclaims any personal or private interest in the engineer's reports which he seeks to examine, and stands squarely upon his status as a taxpayer as he has the perfect right to do, if the reports fall within the purview of the statute. The act, however, was designed to achieve a public purpose, and not to gratify mere idle curiosity. Of course, the reports in question are not any of those specifically described in the statute. They are not "books of minutes, entry or account, bills, vouchers, checks or contracts." If they are covered by the statute, they must be included within the phrase "other papers." It is a very old and well-settled rule of statutory construction that:

"When a particular class is spoken of and general words follow, the class first mentioned is to be taken as the most comprehensive, and the general words treated as referring to matters ejusdem generis." Chegaray v. Mayor, etc., 13 N. Y. 220; In re Hermance, 71 N. Y. 481; People v. New York & M. B. Ry. Co., 84 N. Y. 565; Burks v. Bosso, 180 N. Y. 341, 73 N. E. 58, 105 Am. St. Rep. 762.

The particular words used in the statute refer to records showing the action taken by public officers in the conduct of the public business, following the perfectly reasonable doctrine that the taxpayers who pay the bills are entitled to know what is done with their money. Books of minutes, entry or account, and books, bills, vouchers, checks and contracts all refer to matters which have been accomplished. Construing the words "other papers" in the light of the rule above quoted would limit their meaning to papers which will show what has been done. What the relator seeks is to learn, not what has been done, for that he knows already, but what were the reasons which actuated the commissioners in doing what they did. I think that, in

addition to examining records and "other papers" showing what has been done, a taxpayer has in certain cases the right to examine records bearing upon proposed actions by public officers. Section 51 of the General Municipal Law was originally a part of the so-called taxpayer's acts designed to permit a taxpayer to sue to prevent illegal official acts and to restrain waste of the public funds, and the undoubted purpose of incorporating a right of inspection in those acts was to enable a taxpayer to procure the necessary information to begin an action under the act. Consequently, in cases where the power of a public officer is strictly limited, and he is vested with little or no discretion, it is entirely reasonable that a taxpayer should be permitted to inspect the records before action is taken. Thus, where an officer may under the law let a contract only to the lowest bidder, a taxpayer should be permitted to inspect the bids and forms of contract before an award is made. This is not such a case, however. By the act under which respondents proceed (Laws 1905, c. 724), they are given the widest discretion in selecting those with whom contracts shall be made. By section 29 of the act they are expressly authorized, whenever a contract is advertised, to "select the bid or proposal, the acceptance of which will, *in their judgment,* best secure the efficient performance of the work." This vests in the board an absolute discretion to determine what bid to select, which is not reviewable by or subject to the supervisory control of the courts. Terrell v. Strong, 14 Misc. Rep. 258, 35 N. Y. Supp. 1000; Walter v. McClellan, 48 Misc. Rep. 215, 96 N. Y. Supp. 479, affirmed 113 App. Div. 295, 99 N. Y. Supp. 78, affirmed 190 N. Y. 505, 83 N. E. 1133.

No information which relator could obtain from an inspection of the engineer's reports would serve as a basis of an action to restrain the carrying out of the contract which they have executed, for the result of the exercise of their judgment in the matter had been put beyond the control of the courts. What good purpose is to be served by granting the inspection? The relator suggests none, unless it be to enable him to form a judgment as to whether or not the defendants have acted wisely. But the Legislature has intrusted that matter to the commissioners, and not to the relator. Besides, there can be no assurance that, when relator had read the engineer's reports, he would be in possession of all the information upon which the defendants acted. With great power there comes to all right thinking men a corresponding sense of responsibility, and it is safe to assume that, when the defendants found themselves charged with the duty of selecting the contractor for an important work, solely upon their own judgment as to what would best secure the efficient performance of the work, they availed themselves of every attainable source of information to guide their judgment, and that their engineer's reports constituted but a part of the information upon which they acted. In my opinion the engineer's reports are not within the letter of the statute, and it has not been made to appear that any public advantage will result from making them public. They constitute no records of any action by the defendants, but are merely some part of the information upon which they acted. The commissioners offer

reasons why it would be unwise in the public interests to make reports public, and these reasons should be respected, if there be no reason shown to the contrary, and if the statute does not require the granting of the inspection desired, as I do not think it does.

DOWLING, J., concurs.