Louis J. Capozzoli, J.
This is a proceeding, brought under article 78 of the Civil Practice Act, for an order directing the respondents, comprising a board known as the Triborough Bridge and Tunnel Authority, to permit the petitioner, which publishes a New York City newspaper, to inspect the contract files of the Triborough Bridge and Tunnel Authority for the past 10 years, including contracts covering new construction and the retainer of engineering or consulting services, whether or not let out by competitive bidding; the records of the Authority dealing with leaves of absences granted to executive employees and outside employment of such employees; the contracts of the Authority for the past 10 years dealing with the sale or conversion of property and with the underwriting and flotation of the Authority’s bond issues; and the minutes of meetings of the Authority for the period of 10 years prior to the date of this proceeding.
The argument advanced by the petitioner is threefold. It is claimed:
(1) Respondents are under a legal duty to permit petitioner to inspect the records specified in the petition;
(2) They have no reasonable ground for refusing inspection of their records; and
(3) Their refusal to permit the petitioner to have access to their records abridges the constitutional rights of the petitioner.
As against the contention of the petitioner the essence of the argument of the respondents is that there is no law, constitutional, statutory or common law which commands them to permit the petitioner access to their records on what the respondents claim is a fishing expedition by the petitioner, who, they assert, shows no interest which would justify an inspection of these records by the petitioner.
At the outset the court believes it proper to set forth its understanding of the type of legal entity which characterizes the Triborough Bridge and Tunnel Authority, hereinafter called the “Authority”. It is a public benefit corporation, created by the Public Authorities Law, more particularly sections 552 and 552-a, A public benefit corporation, as defined in subdivision 4 of section 3 of the General Corporation Law is: “a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which *828 enure to the benefit of this or other states, or to the people thereof.” The Authority was created to construct and operate designated bridges, tunnels and other facilities, including the Triborough Bridge, Bronx-Whitestone Bridge, Brooklyn Battery Tunnel, Queens-Midtown Tunnel, Battery Parking Garage, the New York Coliseum and others.
It is a vast business organization whose activities are very extensive and is not like the usual administrative public office. It is autonomous in character and is vested by the Public Authorities Law with the powers, among other things, to make contracts and execute all necessary instruments for its operations ; to make rules for the regulation of its projects and collections of tolls and other charges for the use thereof, subject to agreements with bondholders; to establish the tolls and charges to be collected, subject to agreements with bondholders, etc. (Public Authorities Law, § 553).
The Authority does not depend upon the taxing power of the city or the State and does not spend public money. It relies upon the support of private investors who purchase its bonds and other obligations and thereby supply the funds to enable the Authority to carry on its functions. Such private borrowings are repaid from tolls and other charges collected for the use of the projects.
The members of the board are appointed by the Mayor, each to serve a term of six years. The chairman is designated by the Mayor and no salary is paid to any of the members. They are removed by the Mayor only on stated charges, after a hearing. (Public Authorities Law, § 552.)
At this point the court will consider the first argument of the petitioner that respondents are under a legal duty to grant the inspection herein sought.
It is well settled that, in order to prevail under article 78 of the Civil Practice Act, the petitioner must demonstrate that it has a clear legal right to the relief. (Matter of Pruzan v. Valentine, 282 N. Y. 498; Toscano v. McGoldrick, 300 N. Y. 156.)
Even where a clear right is shown “ the court may consider by way of defense the hardship and injustice to the defendant, the conduct of the applicant and the interest of the third persons.” (Matter of Coombs v. Edwards, 280 N. Y. 361, 364.) Mandamus is an extraordinary remedy, and its issuance is to a great extent discretionary. The courts are chary to issue it so as to cause disorder and confusion in public affairs, even though there may be a strict legal right. (Matter of Andresen v. Rice, 277 N. Y. 271.) ” (Matter of Ahern v. Board of Supervisors, 7 A D 2d 538, 545, affd. 6 N Y 2d 376.)
*829 The petitioner urges that the Authority is conducting its affairs in secrecy and that it claims to be immune from public scrutiny. This court cannot agree. Under the law the Authority is subject to the investigative and auditing processes of certain State and city public officials, amongst them the State Commission of Investigation; the Comptroller of the State of New York; Comptroller of the City of New York; is required to submit to the Governor, the Chairman of the Senate Finance Committee, the Chairman of the Assembly Ways and Means Committee and City Comptroller within 90 days after the end of its fiscal year, a complete and detailed report covering its operations, receipts and expenditures, its assets and liabilities, including status of resources, depreciation, special or other funds, a schedule of its bonds and notes outstanding at the end of its fiscal year, etc. Additionally, under the General Bond Resolutions adopted by the Authority in connection with the issuance of its bonds, a bank trustee, designated to represent the bondholders, is authorized to investigate the financial operations and affairs of the Triborough. Also the holder or holders of not less than 5% of the principal amount of the bonds then outstanding may investigate the financial affairs and operations of the Triborough.
In view of the right of these various agencies and officials to investigate the affairs of the Authority, it is difficult to understand the petitioner’s claim that the activities of the Authority are conducted in secrecy. This court would be the first to condemn any system whereby these immense expenditures of money by the Authority, created for the benefit of the People, could be made without any right of the Peoples’ representatives to investigate the conduct of the Authority. But this court finds that is not so in this instance.
In order to sustain its claim that respondents are under a legal duty to permit this inspection, the petitioner claims, amongst other things, that it has a statutory right of inspection. The court will, therefore, examine this contention. The parties agree that the statute which created the Authority gives no right of inspection by any of its provisions, nor does it declare that the records of the Authority are public records. Petitioner relies on the provisions of section 66 of the Public Officers Law and section 51 of the General Municipal Law.
Section 66 of the Public Officers Law reads as follows: “ A person, having the custody of the records or other papers in a public office, within the state, must, upon request, and upon payment of, or offer to pay, the fees allowed by law, or, if no fees are expressly allowed by law, fees at the rate allowed to a *830 county clerk for a similar service, diligently search the files, papers, records, and dockets in his office; and either make one or more transcripts therefrom, and certify to the correctness thereof, and to the search, or certify that a document or paper, of which the custody legally belongs to him, can not be found.”
It is true that section 66 of the Public Officers Law commands public officers to make available public records to the public, but that presupposes the established fact of a record being a public record. This section 66 does not define a public record. It commands one having custody of it to produce it for inspection. It is true that the public has a clear right to inspect a public record. But not all records kept by a public officer are public records. (People ex rel. Scweller v. Prendergast, 89 Misc. 584, 586; Matter of Blandford v. McClellan, 173 Misc. 15; 1955 Atty. Gen. 228.) Whether a record in the custody of a public officer is available for public inspection depends upon its nature, purpose and applicable statute (1956 Atty. Gen., May 8).
The definition of a public record is found in section 144 of the Education Law wherein it is said, amongst other things, that the term covers “any written or printed book or paper or map which is property of the state or of any county, city, town or village or part thereof, and in or on which any entry has been made or is required to be made by law, or which any officer or employee of the state or of a county, city, town or village has received or is required to receive for filing.” Therefore, the next questions to decide are whether these respondents are officers of the State, of the county, or of the city, whether the books or papers in the office of the Authority are the books or papers of any county, city, town or village or part thereof and also whether they are papers mentioned in section 51 of the General Municipal Law.
Section 51 of the General Municipal Law, which is relied upon by the petitioner, in part reads as follows: “All books of minutes, entry or account, and the books, bills, vouchers, checks, contracts or other papers connected with or used or filed in the office of, or with any officer, board or commission acting for or on behalf of any county, town, village or municipal corporation in this state are hereby declared to be public records, and shall be open, subject to reasonable regulations to be prescribed by the officer having the custody thereof, to the inspection of any taxpayer.”
It is argued by the petitioner that the three members of the Authority are public officers and come under the definition of local officials in that they are limited in the execution of fune *831 tions to a portion of the State. It also argues that, since the Authority acts on behalf of the City of New York, it is subject to the provisions of section 51 of the General Municipal Law, which provides for an inspection of the records of any officers, board or commission acting on behalf of a municipal corporation.
While it is true that there has been no specific adjudication of the question presented in this case, there are certain decisions which are very helpful in this matter. These decisions have discussed the status of authorities such as the New York Housing Authority, New York State Thruway and other boards acting for the city or State.
In Ciulla v. State of New York (191 Misc. 528), the court held that the New York Housing Authority was an independent public corporation, a distinct entity, separate and apart from the State, and not its agent. At pages 530-531, of the opinion, the court said:
“ A housing authority is a public corporation [citing case]. The very name ‘ authority ’ given to this type of public corporation imparts a distinct historical connotation of separateness and juridical distinction from the State and from the municipal corporations of the State * * *
“ The conclusion seems, then, that the members are neither State officers nor city officers, but rather officers of a separate entity — the authority itself.”
Again, at page 536, the court said: “ the intent of the Legislature seems abundantly clear — housing authorities are separate, legally independent public corporations; they are the agents of neither the State nor its municipalities.”
In Bird v. New York State Thruway Auth. (8 A D 2d 495, 496-497), the court said: “ The Thruway is a public corporation created by article 3 of the Public Authorities Law, enjoying a separate existence but exercising a. governmental function. [Citing cases.] * * * Public authorities are not integral parts of the State government. The corporate entity is interposed to protect the State from liability and to free public projects from restraints otherwise applicable to State government. (See 1951 Atty. Gen. ISO, 132.) ”
It has been held that the State Thruway Authority is not required to comply with the provisions of section 135 of the State Finance Law which obligates every officer, board, department, commission or commissions of the State to prepare separate specifications for certain kinds of work to be awarded to contractors. (Matter of Plumbing Assn. v. New York State Thruway Auth., 5 N Y 2d 420.)
*832 In the last-cited case, at page 423, of the opinion by Judge Fuld, in speaking for the court, he said: ‘1 The Thruway Authority was created by a special act of the Legislature (L. 1950, eh. 143) as a 6 public corporation ’ to construct and maintain a thruway system (Public Authorities Law, §§ 352, 353). Although created by the State and subject to dissolution by the State, these public corporations are independent and autonomous, deliberately designed to be able to function with a freedom and flexibility not permitted to an ordinary State board, department or commission. * * * The corporate entity is interposed, it has been said (1951 Atty. Gen. 130, 132), both to ‘ protect the State from liability and enable public projects to be carried on free from restrictions otherwise applicable. ’ ’ ’
Again, at pages 424, 425, Judge Fuld stated: “ As would, of course, be expected, the cases confirm the conclusion that a public authority enjoys an existence separate and apart from the State, even though it exercises a governmental function [citing cases]. * * * However close such relationship may be, though, it is absolutely clear that the Authority stands on its own feet, transacts its business affairs through its own personnel and on its own initiative and is not subject to the strict requirements imposed upon a board or department of the State by a provision such as section 135 of the State Finance Law. (Of. Public Housing Law, § 151-a; General Municipal Law, § 101.) ”
In Matter of Erenberg v. Brill (10 A D 2d 769), the court held that the reports of the investigation of an automobile accident, by employees of the New York State Thruway Authority, in which accident the petitioner sustained injuries, was not a public record required by law to be made or kept and, hence, was not subject to inspection as of right. This being so, and there being no statute expressly requiring that the Authority permit inspection of such papers, the Authority had not failed to perform a duty specifically enjoined by law and, consequently, mandamus was denied. At pages 770-771 of its opinion the court said: “ There is no requirement that the Thruway Authority investigate accidents or compile and maintain reports thereof. Consequently, the report is not a public record required by law to be made or kept (see Education Law, § 144) and hence subject to inspection as of right. This being so, and there being no statute expressly requiring that appellant nevertheless permit inspection of such papers, it cannot be found that he has ‘ failed to perform a duty specifically enjoined upon him by law/ (Civ. Prac. Act, § 1296, subd. 1.) It follows that mandamus does not lie. ’ ’
*833 The court rejected the contention of the petitioner that the right to inspection applies not only to public records, but also to records not strictly public.
In Borek v. Golder (190 Misc. 366), the court had under consideration section 51 of the General Municipal Law, which it read in connection with section 2 of article XVIII of the State Constitution, and, at pages 384, 385, the court said: “ So plain is the wording of the statute that, by no stretch of the imagination can the Authority here under consideration be construed as an integral part of the municipal corporation known as the City of Utica. Bather it is a public corporation with an independent corporate entity authorized by the Legislature to conduct its affairs in the manner prescribed by the Act. (Matter of N. Y. City H. Authority v. Muller, 270 N. Y. 333, 337).”
In the Matter of Reynolds (202 N. Y. 430), the court discussed the application of the provisions of section 51 of the General Municipal Law insofar as the actions of the members of the City Board of Elections were concerned. At page 441 the court said: “ But who are the officers whose illegal acts may be restrained ? Only those ‘ acting or who have acted for or on behalf of ’ the municipal corporation. The defendants, the city board of elections, doubtless are local officers, but no relation of principal and agent, or of master and servant, exists between them and the city. [Citing cases.] They did not act on behalf of the municipal corporation, but for the public in the control and direction of the machinery of the general elections of the State. ’ ’
In the case of Klein v. O’Dwyer (192 Misc. 421), it was held that a taxpayer’s action does not lie against the Board of Transportation in the City of New York under section 51 of the General Municipal Law, because the board is a State instrumentality and therefore is not encompassed within the terms of the last-cited section, despite the fact that such board is recognized as an agent of the city in operating the rapid transit system.
In 1933 the Attorney-General of this State rendered an opinion to the effect that the then Chairman of the Triborough Bridge Authority could accept appointment to the position of Assistant Attorney-General without conflicting with section 1549 of the New York City Charter. (48 N. Y. State Dept. Rep. 511 [1933].) The reasoning which he employed was that the position as Chairman of the Triborough Bridge Authority was not that of an employee or official of the City of New York and, therefore, there was no incompatibility between the two positions and he could hold both.
*834 It is clear to this court, from the authorities hereinabove discussed, that, by applying the reasoning behind these authorities to the factual situation at hand, the conclusion is irresistible that the provisions of section 66 of the Public Officers Law and of section 51 of the General Municipal Law do not apply to this Authority and petitioner can gain no support for its position from those sections.
Of course the court recognizes that, in certain situations where a member of the public is shown to have a personal interest in a situation, he may be allowed an inspection of records which are not within the strict definition of public records (Matter of Stenstrom v. Harnett, 131 Misc. 75, affd. 224 App. Div. 127, affd. 249 N. Y. 606).
In this last-cited case the court allowed petitioner to inspect accident reports, and pointed out that this permission was given because she had established an interest by showing that she was the administratrix of the intestate killed in an accident, otherwise she would not have been allowed to make the inspection, because the court did not hold these reports to be open generally for inspection to the public. In its opinion, at page 77, the court said:
1 ‘ In the case of public records, strictly speaking, all citizens have a right to resort to them, irrespective of their motives or interest. They may examine them to satisfy mere curiosity, or they may take transcripts from them for sale. [Citing-case.] * * *
“As to records and documents not strictly public records, but relating to public business, I do not think there is a right of inspection on the part of all citizens. * * *
‘ ‘ It would be a startling proposition to public officers and to the public as well, if they were informed that all citizens had the right, in the absence of statute to the contrary, to search the files and records of all public officers, as it might suit then-fancy.”
Petitioner claims that, even if it is not entitled to an inspection under the statutes above discussed, it has an interest in the records it seeks to inspect because it is engaged in publishing a newspaper and, therefore, should have access to the records in order to keep the public properly informed. The answer to this argument of the petitioner is found in a fairly recent case, decided by the Court of Appeals, viz: Matter of United Press Assns. v. Valente (308 N. Y. 71, 85) where the court said: “ The fact that petitioners are in the business of disseminating news gives them no special right or privilege, not possessed by other members of the public. Since the only rights they assert are *835 those supposedly given ‘ every citizen ’ to attend court sessions * * * they are in no position to claim any right or privilege not common to 1 every [other] citizen Any incidental benefit, which they might have -derived from the opportunity to report the full proceedings of the Jelke trial, can give them no greater status than they would otherwise have had.”
In Borah v. White County Bridge Comm. (199 F. 2d 213 [7th Cir.]), the court held that a taxpayer and user of the facilities of the Bridge Commission, which was not dependent upon public tax money, could not obtain an inspection of the books and records of the commission, even though a statute specifically declared these books and records open for inspection by persons interested. After affirming that the commission was created for governmental purposes and derived its revenues from services furnished and not from the taxpayers, it concluded that it should be treated as a private corporation and it held that the petitioner could not succeed in his attempt to secure an inspection of the books and records of the commission, because he did not show that he had a special interest in the matter. At page 215 of the court’s opinion, there is the following : “In this connection Illinois courts have held that an individual, merely because he is a taxpayer, cannot be heard to complain against a public or quasi-public corporation or its officers, unless he shows that he has sustained a special injury or suffered a special damage different in degree and kind from that suffered by the public at large. [ Citing cases. ] The remedy must be sought through those representing the public. [Citing cases.] There is no claim here that plaintiff has any interest other than or different from any other taxpayer, or that he has or will sustain a special injury or suffer a special damage, different in degree or kind, from what might be suffered by any other taxpayer.” The court held that a tollpayer and user of the toll bridge was not an interested person to whom records of the operation of the bridge were to be available.
In McGovern Trucking Co. v. Moses (16 Misc 2d 72, 74, affd. 277 App. Div. 758), Mr, Justice Greenberg, sitting in Special Term, New York County said: “ It is the established law that, where the injury complained of is in fact a public injury, and the right violated is a public right, an individual cannot maintain an action for an injunction, or for any other relief, unless he suffers a special injury different from that suffered by the public at large.”
It- follows, therefore, from the cases examined, that this petitioner has not shown itself to have any special interest so as to *836 entitle it to an inspection of the records in question, in the absence of a statutory provision permitting such inspection.
There is still another argument which the petitioner advances in support of this application and that-is based on the claim of the petitioner that the refusal of the respondents to permit access to the records is a violation of the constitutional rights of the petitioner. It asserts that it has a constitutional right not only to publish and circulate news, but, also, to have access to those records which may be the source of news, without any interference from any public officer.
While the petitioner shows itself familiar with the holding of the Court of Appeals in Matter of United Press Assns. v. Valente (308 N. Y. 71, supra) in which it was held that such a right to publish and circulate news does not confer upon the press a constitutional right to access to sources of information not available to others, and seemingly accepts it as the law of this State, it nevertheless continues to press the point that it does have a constitutional right to examine respondent’s records in order to be able to gather the news. So long as this last-cited case stands as the law of this State no newspaper can claim the right of access to sources of information not available to others and the denial of such alleged right is not a violation of the newspaper’s rights, constitutional, statutory or otherwise.
The petitioner has cited a number of cases of the United States Supreme Court which deal with the freedom of speech and of the press under the First and Fourteenth Amendments of the Federal Constitution and certain attempts made to interfere with such freedom.
Certainly, at this date in the history of the United States, there should be no doubt as to the necessity for freedom of speech and of the press. No reasonable American would dare suggest an abridgement of such freedom, except as it is limited by law. In Trimble v. Johnston (173 F. Supp. 651, 655, 656), the court said:
“ Freedom of the press is, of course, one of the basic elements of the Anglo-American concept of ordered liberty. It is considered of such vital importance that it is expressly protected by the First Amendment to the Constitution as against infraction by Federal Law, and is safeguarded by the due process clause of the Fourteenth Amendment, as against interference or transgression by the States. To discuss freedom of the press at length would be superfluous, for we have reached a stage in our development at which we take it for granted. * * *
*837 ‘1 Freedom, of the press comprehends a right to print and publish and to disseminate, circulate, and distribute matters that have been printed, without prior restraint, without license, without censorship, and without discriminatory taxation, but subject to the consequences of the law of libel and to the criminal penalties imposed by such laws, as those that ban obscenity, fraud, incitement to crime, espionage and the like, or that protect the needs of national defense and security. The press is not liberated, however from amenability to law generally. ® * * the liberty of the press does not include any legal right of securing assistance from public officials in procuring information that it is desired to print. It does not comprise any alleged right of access to material not available to others, any more than it would include the privilege of attending closed meetings at which news of interest might possibly be gathered.’ ’ (Emphasis supplied.)
The cases of Grosjean v. American Press Co. (297 U. S. 233); Lovell v. Griffin (303 U. S. 444); Near v. Minnesota (283 U. S. 697); Bridges v. California (314 U. S. 252); Craig v. Harney (331 U. S. 367) are all cited by the petitioner in support of its contention that the action of the Authority is unconstitutional. But those eases are easily distinguishable from the case at bar.
Grosjean v. American Press Co. (supra) involved a license tax for the privilege of publishing a newspaper containing advertising. Of course, this was held unconstitutional as an abridgement of the freedom of the press, as it was a form of restraint upon printed publications or their circulation.
The case of Near v. Minnesota (supra) was decided on the theory that the statute under which Near’s newspaper was declared to be a nuisance because it was regularly and chiefly devoted to publishing malicious, scandalous and defamatory articles, was unconstitutional in that it provided an obvious restraint upon the publication of a newspaper, and certainly is not the case before this court.
In Lovell v. Griffin (supra) the case involved a municipal ordinance forbidding distribution of handbills without a permit and again the court held that such ordinance was unconstitutional in that it interfered with freedom of the press, which includes not only the right to publish, but also the right to distribute.
Again, in the case of Craig v. Harney (supra) and Bridges v. California (supra) the questions were entirely different, as in those cases the restraints took the form of threats to punish for contempt, and punishment for contempt, for publication of reports of judicial proceedings.
*838 It is clear that no constitutional right of this petitioner is violated by the Authority and, therefore, its argument in this regard cannot be sustained.
The court has carefully considered all of the cases cited by the petitioner in support of its various arguments, and it has found none of these cases as an authority favoring the petitioner.
The case of Matter of New York Post Corp. v. Leibowits (2 N Y 2d 677) involved the right of the petitioner in that matter to obtain a copy of a charge delivered by a Judge at a public trial. Certainly that case is far different from the one at bar.
The case of Matter of Walker v. Watson (201 Misc. 556, mod. 280 App. Div. 760) involved the records of the Municipal Civil Service Commission, and the decision rests on the theory that the commission, being a department of the City of New York as set forth in section 894 of the New York City Charter, the members thereof were bound under section 66 of the Public Officers Law to allow an inspection of its records by any taxpayer. It has already been established above that the Authority is not a department of the City of New York, and therefore there is no similarity between the last-cited case and the case at bar. Similarly, in Matter of Egan v. Board of Water Supply (148 App. Div. 177, affd. 205 N. Y. 147) the decision granting mandamus turned on the provisions of section 51 of the General Municipal Law and section 1545 of the City Charter, wherein it is provided that the records of the municipal officers are public records, open to reasonable inspection.
It follows from the above that the Authority is a legal entity, separate and apart from the State which created it and the city and counties which it serves. Not all the laws' which apply to State, county and municipal departments apply to this Authority. In the absence of any language in the statute, under which it was created, giving the public the right to the inspection of its records, the petitioner cannot sustain its claim to such inspection under any other statute.
As to the argument of the petitioner that, if it is not entitled to inspect the records under statutory law, it is so entitled under the common law, the simple answer is that it has not shown the interest which a member of the public must show to obtain an inspection of a record not specifically specified as a public record.
During the oral argument the court made it clear to counsel that it was not concerned with personalities and would pay no attention to the ill feeling which has been engendered between these parties. So far as the court is concerned, it does not question the sincerity or the motives of the petitioner and it can understand petitioner’s desire, believing itself to be engaged *839 in rendering a public service, to wish, to examine the records of the Authority. The only question to be decided is whether the petitioner has the right under the law to make the inspection which is sought.
In order to succeed, petitioner must show that the action of the Authority in denying the inspection of its records is arbitrary, unreasonable and capricious. This it has not done. The court finds that the Authority is well within its legal rights in refusing to grant the inspection and this court is powerless to interfere. No matter how well intentioned the petitioner may be, the law is against it. Until the Legislature says otherwise, an inspection of the records of this Authority, as is sought by the petitioner under the circumstances of this case, cannot be enforced by the court and it finds no abuse of discretion by the respondents. Petition dismissed.