Louis J. Capozzoli, J.
The petitioner, New York World’s Pair 1964-1965 Corporation, a nonprofit membership corporation, hereinafter called ‘1 the Pair ’ ’, has moved for an order quashing and vacating a subpoena duces tecum served upon it by the respondent, as Comptroller of the City of New York, hereinafter called 1 ‘ the Comptroller ’ ’, on the ground that the latter lacks the power and authority to issue such a subpoena. The Comptroller has cross-moved for an order directing the Pair to appear before him, on a date to be set in the order, pursuant to subpoena duces tecum which he heretofore served, to be examined in connection with the financial interest which the Comptroller alleges the City of New York has in a lease between the parties.
There is no dispute that the lease was entered into between the City of New York and the Fair whereby the city demised and leased to the Pair, for a period commencing on the 1st day of June, 1960 and expiring on the the 1st day of January, 1966, certain land, with improvements, in Flushing Meadows Park, for the purpose of conducting a World’s Fair during the years 1964 and 1965.
The lease further provided that the petitioner, within four months after the close of the Fair, at its own expense, would demolish and remove all buildings, structures, pavements and other facilities and would clear the site of all of these buildings, etc., not useful for park purposes and restore the demised premises to a condition satisfactory to the Parks Commissioner ,of the City of New York.
The lease further provided that all net revenue derived by the petitioner and remaining to its credit after the close of the .Fair, and after payment of proper, reasonable and necessary charges and liabilities of any kind, is to be paid to the city and shall be used for the restoration of Flushing Meadows Park, and any balance remaining thereafter is to be used by the City of New York for educational purposes. See article 16 of lease.
It also appears that the City of New York, subsequent to the execution of the lease, made available in each of the capital budgets, for the years 1961, 1962 and 1963, a total sum of $24,000,000 for permanent park improvements in connection with the World’s Fair. These improvements were constructed *685 by the City of New York in accordance with arrangements worked out with the petitioner. However, it is clear that there is no obligation on the part of the Fair to repay this money to the city and there is no dispute as to this fact:
The Comptroller argues that, under article 16, all net revenues remaining after the completion of the Fair, are payable to the City of New York, and, therefore, the city has a direct interest in the manner in which the money received by the Fair is being expended. He insists that he has a right to ascertain whether these payments, heretofore made by the Fair and to be made in the future, are proper, necessary and reasonable, as is provided in the aforesaid article.
As against the Comptroller’s position the Fair emphasizes the fact that it is governed by its members, board of directors, executive committee and officers, amongst whom there are found the “ most prominent citizens of the city, state and nation, from all walks of life ” (affidavit of Mr. Witt, p. 2) and that nowhere in the lease is there any authority provided for any examination or investigation by the Comptroller. It also argues that there is no provision in law which would empower the Comptroller to investigate its affairs, and that, since the Fair was incorporated under the Membership Corporations Law, the only authority which can investigate its affairs is the Supreme Court, under its right of visitation pursuant to section 26 of the Membership Corporations Law.
This court has carefully considered the conflicting views of the parties herein and has reviewed all of the papers presented by both sides, more particularly certain documents and letters which are part of those papers. The conclusion is inescapable that there does exist certain disagreement, confusion and absence of harmonious relations amongst those primarily charged with the duty of operating the Fair. This court has examined the correspondence which has been exchanged between Robert Moses, president of the Fair, and George S. Moore, chairman of the finance committee; also correspondence between the latter and Thomas J. Deegan, chairman of the executive committee of the Fair. A reading of these letters and other documents attached to the papers clearly demonstrates a major disagreement amongst the high personnel of the Fair.
Pursuant to section 5 of the by-laws of the Fair a finance committe was appointed some time ago. This section, amongst other things, provided ‘1 All matters with reference to the financial and fiscal policies of the corporation shall be referred to the Finance Committee which shall report its findings and recommendations to the Executive Committee ”, Amongst the *686 membership of the finance committee there were George S. Moore, chairman, president of the First National City Bank; William H. Moore, chairman of the board of Bankers Trust Company; William S, Renchard, president of Chemical Bank New York Trust Company; David Rockefeller, president of the Chase Manhattan Bank, and Dale E, Sharp, vice-chairman of Morgan Guaranty Trust Company. The parties acknowledge, and the public recognizes, that these gentlemen are outstanding bankers of long experience and are respected as some of the leading figures in the financial world.
All of these gentlemen have resigned from the finance committee in unison because of their disapproval of the manner in which the fiscal affairs of the Fair were being conducted. Their feelings can be best summed up by quoting a paragraph from their common letter of resignation, dated January 16, 1965. “ We feel that the only means at our disposal to bring about the action necessary to safeguard the essential interests of the city, state and the thousands directly involved, employees, exhibitors, investors and others is for us to resign from the Finance Committee, We therefore reluctantly submit our resignations effective immediately.”
The language quoted is very strong and, together with the other information contained in the letter, it is understandable as to why the Comptroller has become concerned on behalf of the city. Believing that it is his duty to investigate, under the circumstances, he served the subpoena upon the Fair which has resulted in the proceedings now before this court. Therefore, the question for this court to decide is whether the Comptroller has the power to proceed with his proposed investigation of the financial affairs of the Fair, insofar as they affect the City of New York.
Section 20 of the General City Law empowers every city in our State, amongst other things:
“ 19. To regulate the manner of transacting the city’s business and affairs and the reporting of and accounting for all transactions of or concerning the city. * * *
‘ ‘ 21. To investigate and inquire into all matters of concern to the city or its inhabitants, and to require and enforce by subpoena the attendance of witnesses at such investigations.”
, Subdivision b of section 93 of the New York City Charter, speaking of the Comptroller, provides as follows: “ He shall, have power to investigate all matters relating to or affecting the finances of the city, including, without limitation the performance of contracts and the receipt and expenditure of city *687 funds, and for such purpose he shall have power to require the attendance and examine and take the testimony under oath of such persons as he may deem necessary.”
; It is fairly well understood that the Comptroller does have the power to investigate matters relating to the finances of the ,City of New York and there can be no serious dispute about this. ,The position which is taken by the Fair, in opposition to the ,Comptroller’s attempt to investigate certain phases of its operation, is that the Comptroller is not authorized by any law or by ¡any agreement between the City of New York, and the Fair to issue the subpoena which is involved in this case.
, In the opinion of this court subdivision b of section 93 of the ,City Charter is plain and directly to the point. The Legislature ,said: “ b. He shall have power to investigate * * * the .performance of contracts * * * and he shall have power to require the attendance and examine and tahe testimony under íoath of such persons as he may deem necessary.” (Emphasis supplied.) How does the Comptroller with authority to do so compel another to attend before him? Is it not a natural inference from the language quoted that the Comptroller was given the power to subpoena? This is especially so when subdivision b of section 93 is read in conjunction with subdivision 21 of section 20 of the General City Law. After all, the Comptroller is not acting for himself, he is acting for the city, and the Legislature in the General City Law said that the city has the power to require and enforce, by subpoena, the attendance of witnesses.
The Fair states that in the past the Comptroller had power to issue subpoenas but, it argues, this power depended upon the provisions of subdivision 1 of section 406 of the Civil Practice Act, read in conjunction with subdivision b of section 93 of the City Charter. It further says that this statutory authorization was repealed by the Legislature when it enacted CPLR 2302 (subd. [a]). The Fair reaches this conclusion by reason of the fact that the Legislature dropped the words “other person” from CPLR 2302 (subd. [a]) after specifically enumerating the persons authorized to issue subpoenas in nonjudicial proceedings. In other words, the Fair insists that when the Legislature failed ,to carry over into the new section these two words it intended to deprive the Comptroller of his power to issue subpoenas.
In advancing this argument the Fair simply disregards the language of subdivision b of section 93 of the City Charter and section 20 of the General City Law. This court cannot believe that it was the intention of the Legislature, by dropping these two words, to revoke the investigatory powers of the Comptroller of the City of New York.
*688 s In Matter of Herlands v. Surpless (171 Misc. 914, affd. 258 App. Div. 275, affd. 282 N. Y. 647) the court had occasion to consider former section 43 of the New York City Charter which provided that the City Council had power to appoint a subcommittee to investigate matters relating to the city. In that section there was language exactly as that which is now under consideration in the case at bar. It was as follows: “ Any such committee shall have power to require the attendance and examine and take the testimony under oath of such persons as it may deem necessary.” (Emphasis 'supplied.) It is to be noted that this last-italicized language is word for word the same as that portion of subdivision b of section 93 of the present charter ¡which has been hereinabove italicized. It is,, therefore, important to consider what the court said about this language. At page 917 of the Miscellaneous Report the court said: ‘ ‘ Whether the couneilmanic committee applies to a court for a subpoena ,as it did in the case at bar, or whether it issues a subpoena on its own authority, pursuant to section 43 of the New York City .Charter or section 406 of the Civil Practice Act, it must eventually apply to this court for an order if it wishes to enforce the subpoena by contempt proceedings against a recalcitrant witness. (Emphasis supplied.) In considering this same case the Appellate Division, at page 227 of its report said: ‘ ‘ Section 43 of the New York City Charter grants the council power to appoint committees to investigate any matter relating to the property, affairs or government of the city, and gives such committees the right to require the attendance of witnesses who may be examined under oath.” And earlier, at page 276, the court said: “ These subpoenas were procured from the Supreme Court under section 7 of the General City Law, although statutory authority appears to exist for-dssuance of subpoenas by the council itself under such circumstances. (New York City Charter, § 43.) ”
In the opinion of this court it iseems clear that in Matter of Herlands v. Surpless (supra) the court specifically held that the Couneilmanic Committee could have issued its own subpoena, on its own authority, provided by section 43 of the charter or it could have moved under section 406 of the Civil Practice Act. Certainly this holding applies to the Comptroller in the case at bar, since the language governing his powers is exactly the same language which was considered in the Eerlands case. Further, irrespective of what has happened to section 406 of the Civil Practice Act, the power of the Comptroller, which existed at the time that section was in force, has in no wise been curtailed by virtue of the omission of the words “ other person ” in the CPLR.
*689 In the recent case -of Matter of Security Adv. Co. v. Lefkowitz (20 A D 2d 860) the court -specifically held that, although the Attorney-General was not one of the officials mentioned in CPLR 2302 (subd. [a]), his powers to issue subpoenas did not depend upon that section but were provided by other legislative acts and, accordingly, reversed the lower court’s ruling which held that CPLR 2302 (subd. [a]) applied. By adopting the same reasoning it is clear that the Comptroller’s power to issue subpoenas does not depend upon the CPLR, but on the above-quoted -sections of the City Charter and the General City Law. (Also, isee, Matter of Tully & Di Napoli, N. Y. L. J., Nov. 22, 1961, p. 11, col. 8; Matter of Comptroller of City of N. Y., 181 Misc. 860 [Greenberg].)
The cases of Matter of New York Post Corp. v. Moses (23 Misc 2d 826, revd. 12 A D 2d 243, revd. 10 N Y 2d 199) and Anti-Defamation League of B’nai Brith v. Morris (N. Y. L. J., July 10, 1964, p. 8, col. 2) are clearly distinguishable from the -situation at hand and the Fair’s reliance on those cases is entirely misplaced.
This court has given thorough consideration to the arguments and authorities advanced by both parties. In view of the papers and documents before the court it is convinced that, if the Comptroller -had done less than that of which the Fair complains, he might well have been subjected to criticism for failing to carry out the duties imposed upon him by law. The law specifically places upon him the duty of investigating the performance of contracts in which the city’s interests are involved. And the wisdom of this law is very well illustrated -by the case at bar.
The city has an important stake in the successful operation of the Fair because the balance of the moneys at hand after it ceases -operations and meets its liabilities is to be paid over to the city. It must also be remembered that the Fair is to restore the park at its own expense.
It is, therefore, fitting and proper that the -Comptroller has taken the action thus far taken, and, rather than oppose him, the Fair might be well advised to co-operate to the end that there be no mystery in anyone’s mind as to what is the real financial situation faced by the Fair and thereby give assurance that due consideration is being given by all concerned to the interests of the people of the city.
For the reasons above stated the motion of the Fair to quash and vacate the -subpoena -served upon it by the Comptroller is denied and the cross motion of the Comptroller for an order directing the Fair to appear before the Comptroller of the City *690 of New York, pursuant to the subpoena heretofore served, is granted and the New York World’s Fair 1964H965 Corporation is directed to appear before the Comptroller on a date to be set in the order to he settled hereon.